UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
RICHARD KRINSKY,

                Plaintiff,

    — against —

SANDRA ABRAMS, SHEILA HANLEY,
JOYCE COPPIN, NEW YORK CITY
DEPARTMENT OF EDUCATION, JOHN
DOE and JANE DOE,

              Defendants.
-----------------------------------------------------X

**MEMORANDUM and ORDER**

01 CV 5052 (SLT) (LB)

**TOWNES, United States District Judge:**

Plaintiff, Richard Krinsky ("Plaintiff" or "Krinsky"), brings this action *pro se*[1] against

Sandra Abrams, Sheila Hanley, Joyce Coppin and the New York City Department of Education

("Defendants"), alleging discrimination and retaliation in violation of Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) *et seq*. ("Title VII"), and the Americans

with Disabilities Act ("ADA"). Plaintiff also alleges analogous state and city law violations

under the New York State Human Rights Law and the Administrative Code of the City of New

York. In addition, Plaintiff asserts state law claims of harassment, defamation and slander, and

intentional infliction of emotional distress. The parties have filed cross-motions for summary

judgment pursuant to Fed. R. Civ. P. 56(c). For the reasons set forth below, Defendants' motion

is granted and Plaintiff's motion is denied.

---

[1] The Court notes that plaintiff is an attorney, and accordingly, his pleadings are not entitled to the same
liberal construction given to non-attorney *pro se* litigants. *See Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 82 n.4
(2d Cir. 2001).

*A. Plaintiff's Classroom Performance Evaluations*

Krinsky commenced employment at James A. Madison High School ("Madison") in February 1994, and he received tenure on February 3, 1998. In 1997, Sheila Hanley was appointed Assistant Principal for Social Studies ("AP") at Madison, and she became Plaintiff's supervisor. The Department of Education ("DOE") requires all teachers to receive a written evaluation by their supervisors at the end of the school year. The year-end rating is based on several factors, including the rating received by teachers throughout the year in classroom observations. Classroom observations, as well as overall year performance, are either rated as satisfactory or unsatisfactory.

On May 9, 1998, after Plaintiff had received tenure in his position, AP Hanley evaluated one of Plaintiff's lessons. Krinsky's lesson received an unsatisfactory evaluation. On December 14, 1998, AP Hanley evaluated another lesson given by Plaintiff as unsatisfactory. AP Hanley also observed Krinsky's lessons in March, May, and June of 1999, and these were rated satisfactory. Plaintiff received a satisfactory rating for the 1998-1999 school year.

No classroom observation was performed for the September 1999 through January 2000 school term because Plaintiff was reassigned to Sheepshead Bay High School from November 5, 1999, until the commencement of the February 2000 school term. On May 18 and 19, 2000, AP Hanley observed Plaintiff's lessons and rated the lessons unsatisfactory. However, although

---

[2] The following facts are taken from Defendant's Rule 56.1 Statement, Plaintiff's Counter Statement of Facts Pursuant to Rule 56.1, and Plaintiff's Additional Undisputed Facts, as well as the exhibits submitted by the parties.

Plaintiff received an unsatisfactory rating for one classroom observation, he was rated satisfactory overall for the 1999-2000 school year.

AP Hanley observed as Plaintiff administered a test on November 22, 2000, and an examination on January 31, 2001. She rated his performance unsatisfactory on each occasion. Her March 23, 2001, observation of Plaintiff teaching a lesson resulted in an unsatisfactory rating as well. On March 29, 2001, Plaintiff, his union representative, and AP Hanley met for a post-observation conference to discuss the March 23, 2001 lesson, but the conference could not proceed because of comments made by Plaintiff against AP Hanley. Plaintiff was advised that further comments could lead to disciplinary action. On May 10, 2001, Plaintiff, his union representative, AP Hanley, and Dr. Abrams, principal of Madison at that time, met to discuss Plaintiff's lack of attendance at the weekly work sessions designed to help improve his work performance. Dr. Abrams advised Plaintiff that this could lead to further disciplinary action, including an unsatisfactory rating for the year.

Pursuant to UFT contract, because Plaintiff had received unsatisfactory classroom observations and was in danger of receiving an unsatisfactory evaluation for the year, his performance needed to be rated by a representative of the Office of the Superintendent of Brooklyn High Schools. Accordingly, Mr. Robert Haberski was sent as a representative from the Superintendent's office to observe Plaintiff's May 30, 2001, lesson. AP Hanley and Dr. Abrams were also present. In a report dated May 31, 2001, Mr. Haberski rated the lesson

unsatisfactory. Based on his performance during the 2001-2002 school year, Plaintiff received an unsatisfactory evaluation for the 2000-2001 school year.[3]

Plaintiff alleges that these negative evaluations were given to him because of discriminatory animus on the part of AP Hanley and Defendants towards male teachers at Madison. However, Defendants allege that during the time Dr. Abrams served as principal, many teachers, both men and women, received unsatisfactory ratings on individual classroom observations. Moreover, Defendants allege that several untenured female teachers received unsatisfactory ratings and were not rehired at Madison for subsequent terms. Defendants also allege that a tenured female teacher, Phyllis Fink, received an unsatisfactory year-end evaluation from Dr. Abrams for two successive school years, and the teacher was then terminated.

In addition to the unsatisfactory ratings, Krinsky alleges he was subject to other unfair and discriminatory practices, such as denials of his teaching requests. Each semester teachers were allowed to rank the classes they wanted to teach in order of preference. Plaintiff indicated his top three preferences for classes each semester. He always asked to teach law classes, with his first preference being the sophomore law class. Every semester at Madison from 1998 through 2002, Plaintiff was given the opportunity to teach the sophomore law class. His other

_____

[3] Plaintiff also received an unsatisfactory evaluation the following year. Because Plaintiff received two successive years of unsatisfactory ratings for the school years 2000-2001 and 2001-2002, and because he had engaged in serious misconduct in that period of time, Charles Majors, the Superintendent of Brooklyn High Schools at the time, requested that Charges and Specifications be brought against Plaintiff. Accordingly, on or about November 20, 2002, in accordance with Education Law §3020, Plaintiff was served with disciplinary Charges and Specifications. DOE claimed that Plaintiff's improper conduct was just cause for termination. In accordance with Education Law § 3020-a, James A. Cashen was designated as a hearing officer. Thereafter, 29 days of hearings took place. In a decision dated December 16, 2003, Arbitrator Cashen found Plaintiff guilty of virtually all of the Specifications and concluded that termination was the appropriate penalty. Plaintiff was terminated by DOE on December 16, 2003. On or about December 27, 2003, Plaintiff instituted an Article 78 proceeding in New York State Supreme Court challenging the Arbitrator's decision.

Because Plaintiff's termination occurred well after the Complaint and Second Amended Complaint were filed in this case, neither his termination, nor any of the surrounding circumstances, will be considered in the Court's analysis. As Plaintiff states in his motion papers, "termination is not the genesis of Plaintiff's Complaint."

classes were assigned with regard to union rules and rotations. Despite being given his first choice of the sophomore law classes, Plaintiff complained about also being given a Global Studies class that did not end with a Regents examination. He also complained that non-law classes were being scheduled in the Ruth Bader Ginsburg Courtroom ("Courtroom"), a fancy new classroom, which he claimed had been specifically built for the law classes. He was upset that female teachers who taught non-law classes were being scheduled to use the Courtroom.

Plaintiff also alleges he was denied certain House Coordinator and other compensatory positions. Madison consists of six major houses within a large building environment and each house has a coordinator to provide for the smooth functioning of the house. The position of house coordinator is treated as a job for which compensatory time is earned. According to the rules of the UFT, teachers apply for the coordinator position, which is awarded based on seniority and to those who have the least amount of compensatory time. Plaintiff alleges that these positions were only given to women. Defendants note, however, that at least one of these positions was held by a man, Mr. Evan Schwartz, during the time period at issue. According to Defendants, Plaintiff was never assigned as a coordinator because he never applied for the positions that were posted. Plaintiff, however, alleges that he did apply for them. Additionally, Plaintiff claims that he was denied "per-session" positions that offered additional salary and pension credit, although copies of the hourly Professional Personnel Time Reports for the years 1998-2001 show that Plaintiff received per-session payments for his work with the Mock Trial Club.

Prior to 2001, Plaintiff notes that he was always granted the right to attend three-day conferences sponsored by The New York State Department of Education and The New York

State Bar Associations's Law, Youth and Citizenship Committee.  He alleges, however, that in 2001 he was no longer given permission to attend the conferences.

Plaintiff alleges other discriminatory practices on the part of Defendants, including limitation of his and his male colleagues' access to the bookroom  where necessary supplies such as maps and workbooks were kept.  Females, on the other hand, had unrestricted access to the bookroom.  Plaintiff accuses AP Hanley of creating a gender rift at Madison, alleging that her animosity towards males was due to the fact that she was sexually harassed by a senior male colleague at a previous job.

### B. Plaintiff's Request for an Accommodation

In May 1999, Plaintiff notified Defendants that he was diagnosed with severe allergies to dust and pollen.  By letter dated September 13, 1999, Plaintiff requested an accommodation for his alleged disability caused by allergies.  Specifically, Plaintiff asked for a different classroom, air conditioning and a white marker board instead of a chalk board.  Plaintiff indicated that he believed that the Ruth Bader Ginsburg Courtroom "might be the only room that could possibly comply" with the mandate to reasonably accommodate his disability.

In response, by letter dated October 5, 1999, Dr. Abrams requested of Superintendent Coppin that a medical examination be conducted of Plaintiff to determine the appropriateness of a "reasonable accommodation."  Superintendent Coppin requested that, pursuant to Education Law § 2568, a medical examination of Plaintiff be conducted.  After reviewing the medical information, the DOE advised Plaintiff that his needs would be accommodated.   The Medical

Bureau advised Plaintiff that he was entitled to a well-ventilated room but that his request for air-conditioning was denied.

In order to comply with the Medical Bureau's directive, Plaintiff was assigned to Room 512B at Madison.  According to Defendant, the room was well-ventilated and a dry erase board was placed in the classroom.  However, Plaintiff alleges the room was moldy and dirty, and he thought the room aggravated his allergies.  He alleges he was diagnosed with asthma in May 2000, in part because of the conditions of the classroom.  Plaintiff filed a grievance claiming his assignment to Room 512B was a violation of his rights under the Americans with Disabilities Act.  This grievance was subsequently denied by Superintendent Coppin.

Because Plaintiff complained about the air quality of room 512B, and at Plaintiff's request, Plaintiff's union hired Olmstead Environmental Services, Inc. ("Olmstead") to perform a safety and health inspection to determine both the air quality of Room 512B and the feasibility of assigning Plaintiff to the Courtroom at Madison.  An inspection was performed by Olmstead on November 2, 2000.  Olmstead found that Room 512B met the requirements listed in the Board of Education accommodation guidelines and that the Courtroom was inappropriate for Plaintiff's allergies and asthma because it had carpeting.  The Olmstead report recommended four steps Madison could take to remove any possible cause of Plaintiff's allergic reactions. Defendants allege these recommendations were implemented by the school custodian to meet the requirements for Plaintiff's accommodation.  Plaintiff claims they were not.

*C. Plaintiff's Disciplinary Problems and Transfer to Sheepshead Bay High School*

On or about November 3, 1999, a teacher submitted to Dr. Abrams a statement containing remarks made by Plaintiff to the students about shooting certain people at the school. On or about the same date, Plaintiff sent a letter to AP Hanley, in which he addressed her as "Mein Fuhrer," referred to her as a "snooperviser," and referred to himself as "an indentured subject of her sick experiment." Plaintiff claims the letter was in response to AP Hanley's verbal threat to give Plaintiff a poor evaluation. Prior to November 5, 1999, Plaintiff sent two handwritten letters to AP Hanley in which he was very disrespectful and very critical of her. On November 5, 1999, numerous inappropriate posters were displayed on several locations in Plaintiff's classroom. Because of the content of these posters and letters, Dr. Abrams believed that Plaintiff represented a threat to the safety of staff and students at Madison, and therefore on November 5, 1999, pursuant to Education Law § 2568, Dr. Abrams requested of Superintendent Coppin that a psychological evaluation of Plaintiff be conducted.

Pending the results of his evaluation, Krinsky was reassigned to administrative work at Sheepshead Bay High School in Brooklyn. Plaintiff's photograph was given to school safety officers and custodial staff who worked in the Madison facility during evenings and weekends to ensure that Plaintiff would not enter the building. From November 5, 1999 to January 31, 2000, Plaintiff remained at Sheepshead Bay High School. During that time period, Plaintiff received his full pay and was not required to use any of his sick leave or vacation time. On November 17, 1999, the Medical Bureau found Plaintiff fit to perform his teaching duties and Krinsky returned to Madison for the Spring 2000 term commencing January 31, 2000.[4]

---

[4] Plaintiff was sent for another psychological evaluation in October 2000 because he continued to send inappropriate letters to school administrators referencing "tyrants, henchmen, vendettas, and violence" in addition to other disciplinary problems.

Plaintiff filed an EEOC charge on August 9, 2000. After receiving a Notice of Right to Sue, he filed the instant lawsuit on July 30, 2001, and a second amended complaint on September 9, 2002.

## DISCUSSION

### A. *Standard for Summary Judgment*

Summary judgment is generally appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994) (quoting Fed. R. Civ. P. 56(c)). The relevant governing law in each case determines which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *See Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there is a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002,

1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Consol. Rail Corp*., 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. *See Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996).

Summary judgment is appropriate in discrimination cases. *See Weinstock v. Columbia Univ*., 224 F.3d 33, 41 (2d Cir. 2000); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). The Supreme Court has reiterated that trial courts "should not 'treat discrimination differently from other ultimate questions of fact.'" *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 148, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524 (1993)).


### B. Statute of Limitations

A plaintiff may not assert Title VII claims based on events more than 300 days prior to the filing of an EEOC charge. *See* 42 U.S.C. § 2000e-5(e)(1); *Butts v. Dep't of Hous. Pres. & Dev*., 990 F.2d 1397, 1401 (2d Cir. 1993), *superceded by statute on other grounds as stated in Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 693 (2d Cir. 1998). Krinsky filed an EEOC Charge on August 9, 2000. Thus, Plaintiff's Title VII claims are time-barred to the extent they rely on allegations prior to October 13, 1999.

Although it is unclear from Krinsky's papers whether he is making a continuing violations argument, the Court construes his papers as making such an argument. The doctrine of continuing violations allows plaintiffs to file certain discrimination claims even after the statute of limitations has passed. Prior to 2002, the continuing violation doctrine permitted recovery for discriminatory conduct that occurred outside of the applicable limitations period if the conduct was part of a "practice or policy" of discrimination. *See Nakis v. Potter*, 422 F. Supp. 2d 398, 409 (S.D.N.Y. 2006). However, the scope of the continuing violation doctrine was substantially restricted by the Supreme Court's decision in *National Railroad Passenger Corporation v. Morgan,* 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002). In that case, the Supreme Court held that "each discriminatory act starts a new clock for filing charges alleging that act." 536 U.S. at 113. The Court stressed that a discrete retaliatory or discriminatory act "occurred" on the day that it "happened" and therefore, a party "must file a charge within . . . 300 days of the date of the act or lose the ability to recover for it." *Id.* at 110. The Court went on to identify "termination, failure to promote, denial of transfer, or refusal to hire" as examples of conduct that constituted a discrete discriminatory act. *Id.* at 114.

The Court did, however, note that a hostile work environment claim was different, and would support the application of the continuing violation doctrine because such a claim "is composed of a series of separate acts that collectively constitute one unlawful employment practice." 536 U.S. at 117 (internal quotation and citation omitted). Thus, where a plaintiff alleges a hostile-environment claim, conduct outside the applicable limitations period could be asserted so long as one act giving rise to the hostile-environment claim was within the

limitations period.  *Id.*  Therefore, for the purposes of analyzing Plaintiff's hostile environment claim under Title VII, the Court will consider the entire time period of his claim.

However, although the Court will consider the entire time period for the purposes of Plaintiff's hostile environment claim, Plaintiff is precluded under *National Railroad* from asserting in this action any pre-October 13, 1999 conduct by defendants as specific, compensable acts of discrimination or retaliation under Title VII.   But, "time-barred conduct may still be offered as evidence of discriminatory intent to support timely claims."  *Nakis*, 422 F. Supp. 2d at 410; *see also Nat'l R.R.*, 536 U.S. at 113 ("Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.").

*C. Title VII and ADA Claims Against Individually Named Defendants are Dismissed*

Plaintiff's claims against the individual defendants must be dismissed because there is no individual liability under Title VII.  *See Tomka v. Seiler Corp.* 66 F.3d 1295, 1317 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus. v. Ellerth*, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998).[5]  Similarly, the ADA does not provide for liability by individual employees.  *See Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir. 1996); *EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1282 (7th Cir. 1995); *Lauria v. Donahue*, 438 F. Supp. 2d 131, 139-40 (E.D.N.Y. 2006).  Accordingly, Plaintiff's Title VII and ADA claims against individually named defendants Abrams, Hanley, and Coppin are dismissed.

---

[5] Both Title VII and the ADA define the term employer as "a person engaged in an industry affecting commerce who has fifteen or more employees . . . and any agent of such a person." 42 U.S.C. § 2000e(b).  In *Tomka*, the Second Circuit focused on the language of Title VII and the word "employer" and inferred that Congress never sought to hold individuals liable under Title VII.  66 F.3d at 1314.  The Court reasoned that the agent clause in Title VII, which limits liability to employers with fifteen or more employees, was designed to protect small entities from expensive discrimination litigation.  Accordingly, the Court concluded that it was implausible to think that Congress would immunize small employers, while at the same time imposing liability against individual employees.  *Id.*

*D. Title VII Discrimination Claim Against Defendants Must Be Dismissed*

Title VII makes it "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). Plaintiff's gender discrimination claims asserted under Title VII are governed by the burden-shifting analysis set forth in *McDonnell Douglas Corporation v. Green*. 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). To establish a prima facie case of employment discrimination, a plaintiff must show that: (1) he is a member of a protected class; (2) he is qualified for the position; (3) he has suffered an adverse employment action; and (4) the circumstances surrounding that action give rise to an inference of discrimination. *See id*. Once the plaintiff has made out a prima facie case, the employer is required to offer a legitimate, nondiscriminatory business rationale for its actions. *Id.* at 802-803. If the employer articulates such a reason, the presumption of discrimination dissolves, and the burden shifts back to the plaintiff to prove that the employer's stated reasons are merely pretextual and that discrimination was the real reason, or one of the real reasons, for the adverse employment action. *Id.* at 804.

In "reverse discrimination" claims such as Krinsky's gender discrimination claim, some courts have applied a somewhat stricter (toward the plaintiff) version of the *McDonnell Douglas* standard, holding that a prima facie case of reverse discrimination must indicate some "background circumstances supporting the suspicion that the defendant is that unusual employer who discriminates against a favored group." *Brierly v. Deer Park Union Free School Dist.*, 359 F. Supp. 2d 275, 294 n.7 (E.D.N.Y. 2005) (citing *Parker v. Baltimore & Ohio R.R. Co.*, 652 F.2d

1012, 1017 (D.C. Cir. 1981)).  Although some district courts in this Circuit have applied the heightened standard, *see e.g.*, *Olenick v. New York Tel.* 881 F. Supp. 113, 114 (S.D.N.Y. 1995), others have not; *see, e.g., Ticali v. Roman Catholic Diocese of Brooklyn*, 41 F. Supp. 2d 249, 260-262 (E.D.N.Y. 1999); the Second Circuit Court of Appeals has apparently not taken a position on the issue.  *See Seils v. Rochester City School Dist.*, 192 F. Supp. 2d 100, 109 (W.D.N.Y. 2002).  The correct standard need not be determined in this case, because regardless of the test used, Plaintiff has failed to establish a prima facie case of discrimination.[6]  He has not shown that he has suffered any adverse employment action giving rise to an inference of discrimination.

An employment action is adverse if it causes an employee to endure a "materially adverse change" in terms and conditions of his employment.  *Galabya v. New York City Bd. Of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000).  "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation."  *Id.* (quoting *Crady v. Liberty Nat. Bank and Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir. 1993)).

Plaintiff contends that Defendants limited Plaintiff's access to necessary materials, denied him access to the bookroom, denied Plaintiff's request to attend seminars, denied Plaintiff certain coordinator positions, and gave him unsatisfactory marks on his lesson reviews.  He also claims he was required to undergo a psychological evaluation.  None of these qualify as "adverse employment actions."  To be "materially adverse," a change in working conditions must be

---

[6] Therefore, the issue of whether the fact that AP Hanley was sexually harassed at a previous position qualifies as the necessary "background circumstance" is not reached by the Court.

"more disruptive than a mere inconvenience." *Galabya*, 202 F.3d at 640 (quoting *Crady*, 993

F.2d at 136). Plaintiff's allegations that he was denied a key to the bookroom or denied

permission to attend a seminar, even if true, do not rise above a level of "mere inconvenience."

*See Norris v. New York City Hous. Auth.*, No. 02-6933, 2004 WL 1087600, at *17 (S.D.N.Y.

May 14, 2004) (withholding office equipment is not an adverse change, but rather a mere

inconvenience). Also, referral for a psychological evaluation is not considered an adverse

employment action. *See Bazile v. City of New York*, 215 F. Supp. 2d 354, 386 (S.D.N.Y. 2002)

(finding that psychological evaluations were not adverse employment actions but instead fell into

a category of things that "a well run office should do" to ensure that its employees are capable of

handling the demands of their jobs). Moreover, courts in this Circuit have held that "[n]egative

evaluations alone, without any accompanying adverse consequences are not adverse employment

actions." *Gamble v. Chertoff*, No. 04-9410, 2006 WL 3794290, at *6 (S.D.N.Y. Dec. 27, 2006)

(internal quotation and citation omitted).[7]

Plaintiff also claims that his reassignment to Sheepshead Bay High School was an

adverse employment action. However, an employment action may not be sufficiently adverse to

support a cause of action if it is not a final employment decision, but rather an interlocutory or

mediate decision. *Brady v. Wal-Mart Stores, Inc.*, 455 F. Supp. 2d 157, 170 (E.D.N.Y. 2006).

Title VII contemplates discrimination on what can be characterized as ultimate employment

decisions such as hiring, granting leave, discharging, promoting, and compensating. *Id.* Mediate

---

[7] Plaintiff asserts that the negative evaluations did ultimately lead to his termination. However, Plaintiff received numerous classroom evaluations that were negative, but still received satisfactory overall evaluations from 1998-2000, with no change in compensation and benefits. Even when Plaintiff received an overall negative evaluation for the 2000-2001 school year, his compensation and benefits were not affected. It was only after two years of negative overall evaluations plus numerous disciplinary problems that Plaintiff was brought up on charges and eventually terminated. The negative evaluations, standing alone, did not alter benefits, compensation, or job title.

actions, therefore, even if constituting an adverse employment action, may not lead to legally cognizable harm if by some subsequent action on the part of the employer, the employee is restored to his or her previous status. *Id.; see also Leget v. Henderson,* No. 99-3636, 2001 WL 43615, at *6 (S.D.N.Y. January 18, 2001) (stating that a temporary adverse transfer followed by a complete restoration of employment status may not be actionable). For example, in *Lumhoo v. Home Depot USA, Inc.*, 229 F. Supp. 2d 121, 139 (E.D.N.Y. 2002), the court found that an employee who was wrongfully terminated (and who remained unemployed for three weeks) but was subsequently reinstated to his former job with full back pay, benefits, seniority status, and all references to the discharge removed from his file, did not experience an adverse employment action.

Even assuming, *arguendo*, that Plaintiff's transfer was an adverse employment action, Plaintiff's claim must fail because Plaintiff has not offered evidence "adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act." *Marlow v. Office of Court Admin. of State of New York*, 820 F. Supp. 753, 756 (S.D.N.Y. 1993) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977)). While courts have held that there is no single way to establish circumstances giving rise to an inference of discrimination, it is clear that there must be evidence of a causal connection between the adverse employment action and Plaintiff's membership in a protected class.[8] *See Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37-38 (2d Cir. 1994).

_____

[8] A plaintiff may also raise an inference of discrimination by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group. *See Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). It appears Plaintiff has tried to establish a disparate treatment claim by alleging that men were denied access to the bookroom while women were given unlimited access, that male teachers were given more unfavorable ratings, that female teachers were given preference in choice of classes, or that female teachers' classes were being scheduled in the Courtroom. However, many of these allegations, such as the fact that Krinsky was not given his teaching preferences, were contradicted by documentary

Plaintiff has put forward no evidence that his temporary transfer out of Madison was based on his gender.  Plaintiff's transfer was a personnel decision made by the administrators at Madison, based on their understanding of what was in the best interests for the safety and security of students and staff at Madison.  "The role of this Court is not to evaluate the wisdom of personnel decisions, but merely to determine whether the decisions were rational and non-discriminatory." *Sarmiento v. Queens College CUNY,* 386 F. Supp. 2d 93, 98 (E.D.N.Y. 2005).  The Court finds that the decision to transfer Krinsky under the circumstances was appropriate, and his discrimination claims must be dismissed.

### E. Plaintiff's Claim also Fails Under a Mixed Motives Analysis

Krinsky's motion papers indicate that a mixed-motive analysis should be applied to the facts of his case.  In mixed-motive cases, instead of using the *McDonnell Douglas* standard, the Court applies a different analysis set out in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989) (plurality opinion):  if the plaintiff establishes that a prohibited discriminatory factor played a "motivating part" in a challenged employment decision, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision anyway.  *See also Ostrowski v. Atlantic Mut. Ins. Cos.*, 968 F.2d 171, 180 (2d Cir. 1992).  To warrant a *Price Waterhouse* burden shift, the plaintiff must show that an impermissible criterion was in fact a motivating or substantial factor in the employment decision.  Only after it is shown that "the forbidden animus was a motivating factor

---

evidence which Plaintiff did not dispute that was put forward by Defendants.  Furthermore, Plaintiff has not shown he was similarly situated to any members outside his protected class.

in the employment decision" does the burden shift to the employer to prove that it would have made the same decision absent the discriminatory factor.  *See Ostrowski*, 968 F.2d at 181.

Because the plaintiff must show that the evidence is *sufficient* to allow a fact finder to infer both permissible and discriminatory motives, the plaintiff's initial burden in a *Price Waterhouse* mixed-motive case is heavier than the *de minimis* showing required to establish a prima facie *McDonnell Douglas* case.  *Raskin v. Wyatt Company*, 125 F.3d 55, 60 (2d Cir. 1997). Evidence potentially warranting a *Price Waterhouse* burden shift includes, *inter alia*, policy documents and evidence of statements or actions by decision makers "that may be viewed as *directly reflecting* the alleged discriminatory attitude."  *Raskin,* 125 F.3d at 60-61 (internal quotations and citation omitted) (emphasis in *Raskin).*  "In short, to warrant a mixed-motive burden shift, the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support his allegations of discriminatory treatment."  *Raskin*, 125 F.3d at 61 (internal citations omitted).

Because Krinsky has not produced any evidence of gender discrimination on the part of Defendants that would constitute a smoking gun, or even a thick cloud of smoke, Krinsky has failed to meet his burden; a mixed motive burden shift is not appropriate and Krinsky's claim cannot survive summary judgment under this analysis.

### F. Plaintiff Has Failed to Show a Hostile Work Environment

Under Title VII, an actionable hostile work environment means a workplace "permeated with discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions" of the victim's employment and create an abusive working environment. *Hayut v. State Univ. of New York*, 352 F.3d 733, 745 (2d Cir. 2003) (internal quotations and

citations omitted). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview." *Harris v. Forklift Sys. Inc.,* 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993). In *Harris*, the Supreme Court established a non-exclusive list of factors relevant to determining whether discrimination is severe and pervasive: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. As a general rule, "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Perry* v. *Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (citations omitted).

Here, Krinsky has not established that the incidents were sufficiently severe or pervasive such that they altered the conditions of his working environment. Several negative classroom evaluations, limitation of access to the supply room, a psychological evaluation, and denial of attendance at conferences is not severe or pervasive enough to create a hostile or abusive work environment. *See, e.g., Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998) (finding that offhand comments and isolated incidents will not amount to discriminatory changes in the terms and conditions of a plaintiff's employment that would sustain a hostile work environment claim)*; Torres v. Pisano,* 116 F.3d 625, 631 (2d Cir. 1997) ("isolated, minor episodes of harassment do not merit relief under Title VII"); *Alfano v. Costello*, 294 F.3d 365, 377-380 (2d Cir. 2002) (finding that twelve incidents of purported harassment occurring over four years of employment were insufficient as a matter of law to meet the threshold of severity or pervasiveness required for a hostile work environment claim).

Krinsky has also failed to show that the hostile work environment was caused by animus towards him as a result of his membership in a protected class.   It is "important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination.  Otherwise, the federal courts will become a court of personnel appeals." *Alfano*, 294 F.3d at 377;  *see also Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir.2001) ("It is axiomatic that mistreatment at work . . . [including] subjection to a hostile environment . . . is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic.").  "An environment that . . . arises from personal animosity, is not actionable under the civil rights statutes." *White v. Fuji Photo Film USA, Inc.*, 434 F. Supp. 2d 144, 154 (S.D.N.Y. 2006).  Krinsky's hostile environment claim is therefore dismissed.

### G. Plaintiff's Retaliation Claims

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [such employee] has opposed any practice made an unlawful practice by this subchapter . . . " 42 U.S.C. § 2000e-3(a).  To establish a prima facie case of retaliation under Title VII, an employee must show:  (1) that he participated in a protected activity and that this participation was known to the defendant; (2) the occurrence of an adverse employment action; and (3) a causal connection between the protected activity and the adverse employment action. *Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003).  As with direct discrimination claims, once the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for the allegedly retaliatory employment decision. *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759,

768 (2d Cir. 1998).  If the defendant does so, the burden returns to plaintiff, who must show that

the articulated non-discriminatory reason for the defendant's action is in fact a pretext for

retaliation. *Id.* at 769.

It should be noted that the Supreme Court recently decided that Title VII's anti-

retaliation and anti-discrimination provisions are "not coterminous."  *Burlington N. & Santa Fe*

*Ry. Co. White*, – – U.S. – –, 126 S. Ct. 2405, 2414, 165 L. Ed. 2d 345 (2006).   In *Burlington*, the

Court ruled that "the anti-retaliation provision [of Title VII], unlike [Title VII's] substantive

provision, is not limited to discriminatory actions that affect the terms and conditions of

employment."  126 S. Ct. at 2412-13; *see also Kessler v. Westchester County Dep't of Social*

*Services*, 461 F.3d 199, 208 (2d Cir. 2006).  Rather, to prevail on a claim of retaliation under

Title VII, a plaintiff must show that a reasonable employee would have found the challenged

action materially adverse, which in the retaliation context "means it well might have dissuaded a

reasonable worker from making or supporting a charge of discrimination."  *Burlington*, 126 S.

Ct. at 2415 (internal quotation and citation omitted).

DOE argues that Plaintiff cannot establish a prima facie case of retaliation because

Plaintiff did not participate in a protected activity.  Plaintiff contends that he complained of

gender discrimination at Madison in early 1998, but Defendants allege that Plaintiff has not

produced any evidence to support this claim.  According to Defendants, the only complaint they

have received from Plaintiff that even remotely refers to gender discrimination is a November 3,

1999 unsigned typewritten letter that Plaintiff gave to Dr. Abrams.  In this case, not withstanding

Defendants' arguments to the contrary, it will be assumed that Krinsky engaged in protected

activity in both 1998, when he allegedly complained about discrimination, and on November 3,

1999, via the letter to Dr. Abrams. Therefore, Plaintiff has established the first prong of a retaliation claim.

Defendants also argue that Plaintiff has not suffered any adverse employment action, but even if he did, he cannot establish a causal connection between the protected activity and the adverse employment action. While most of the acts about which Plaintiff complains do not rise to the level of an adverse employment action, under the heightened *Burlington* standard, the Court notes that a negative evaluation, or the threat of a negative evaluation, while not an adverse employment action that affects terms and conditions of employment, might "dissuade[ ] a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 126 S. Ct. at 2415; *see also Wright v. Stern*, 450 F. Supp. 2d 335, 378 (S.D.N.Y. 2006). For the purposes of the retaliation analysis, the Court will consider the negative classroom evaluations to be adverse employment actions.

The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action. *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 224 (2d Cir. 2001). In this case, Plaintiff's retaliation argument is undercut by the fact that, although Plaintiff says he complained in both 1998 and 1999, Defendants rated Plaintiff's overall performance for the 1997-98, 1998-99, and 1999-2000 school years as "satisfactory." Plaintiff did not receive an overall "unsatisfactory" evaluation until 2000-2001. The fact that Plaintiff continued to receive satisfactory evaluations after he allegedly complained of discrimination does not support a causal connection between the protected activity and the adverse employment action.

Plaintiff's transfer to Sheepshead Bay High School in November 1999 is also an adverse employment action for the purposes of the analysis. This transfer occurred only a few days after

22

Plaintiff gave Dr. Abrams a letter regarding gender discrimination at Madison, and therefore, a causal connection between Plaintiff's alleged complaints and his transfer is satisfied by the temporal proximity between the two.

Because Plaintiff has established a prima facie case of retaliation, the burden shifts to the Defendant to articulate a legitimate non-discriminatory reason for the allegedly retaliatory employment decision. *Fisher v. Vassar College*, 70 F.3d 1420, 1433 (2d Cir. 1995). The employer's burden here is one of production of evidence rather than one of persuasion. *See id*. According to Defendants, Plaintiff was transferred to Sheepshead Bay High School pending a psychological evaluation because, due to written letters and statements made by Plaintiff, Defendants believed he represented a threat to the safety of the staff and students at Madison.

Defendants have articulated a non-discriminatory reason for Plaintiff's transfer so the burden returns to Plaintiff, who must show that the articulated non-discriminatory reason for the defendant's action is in fact a pretext for retaliation. Plaintiff has not presented any evidence that Defendant's reason is pretextual. While it is clear from the record that Plaintiff and AP Hanley had a contentious relationship, Plaintiff does not provide evidence that he was transferred because he complained of gender discrimination. Plaintiff does not deny that he directed hostile and threatening remarks towards AP Hanley and other administrators at the school. The federal discrimination statutes bar retaliation against the exercise of protected rights; "they do not clothe the complainant with immunity for past and present inadequacies, unsatisfactory performance, and *uncivil conduct*." *Brierly*, 359 F. Supp. 2d at 301 (internal citations omitted) (emphasis in *Brierly)*. In *Burlington*, the Supreme Court emphasized that "personality conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable under [the

retaliation provisions].”  126 S. Ct. at 2415 (internal quotations and citations omitted).

Plaintiff’s retaliation claim is, therefore, dismissed.


### H.  Plaintiff’s Claims under the ADA

Plaintiff argues that Defendant discriminated against him by failing to reasonably

accommodate his disability.  The ADA prohibits employment discrimination “against a qualified

individual with a disability because of the disability of such individual.”  42 U.S.C. § 12112(a).

Discrimination is defined to include the failure to make a reasonable accommodation for the

known physical disabilities of a qualified individual.  42 U.S.C. § 12112(b)(5)(A).  In order to

make a prima facie case of discrimination based on an employer’s failure to accommodate, a

plaintiff must show “(1) that he is an individual who has a disability within the meaning of the

statute, (2) that an employer covered by the statute had notice of his disability, (3) that with

reasonable accommodation, he could perform the essential functions of the position sought, and

(4) that the employer has refused to make such accommodations.”  *Stone v. City of Mount

Vernon*, 118 F.3d 92, 96-97 (2d Cir. 1997).  Defendant apparently concedes that Plaintiff is

disabled,[9] but argues that it offered reasonable accommodation for the Plaintiff’s disability.

---

[9] Defendants do not raise the issue, but there is a substantial question whether Plaintiff’s allergies or asthma entitle him to any relief under the ADA.  The ADA defines a disability as “a physical or mental impairment that substantially limits one or more of the major life activities of an individual.”  42 U.S.C. § 12102(2)(A).  However, “[a]n impairment which only restricts a plaintiff from working in a particular location does not satisfy the disability requirement under the ADA.”  *Johns-Davila v. City of New York*, No. 99-1885, 2000 WL 1725418, at *11 (S.D.N.Y. Nov. 20, 2000); *see also Weber v. Strippit, Inc.* 186 F.3d 907, 913 (8th Cir. 1999) (because plaintiff “claimed only to be unable to relocate to a particular location and not to be restricted from working in an entire class or broad range of jobs” the district court correctly denied his disability claim under the ADA).

According to Plaintiff, his asthma and/or allergies only presented a problem under certain conditions or in certain locations (as he claimed his breathing was fine in the Courtroom).  Courts have not viewed location-specific medical problems of this type as disabilities under the ADA.  *See Gomez v. Laidlaw Transit Inc.*, 455 F. Supp. 2d 81, 86-7 (D. Conn. 2006) (finding that plaintiff’s asmtha did not substantially limit her ability to breathe and, therefore, defendant did not discriminate by failing to move her to another office even though her current one was allegedly unventilated and moldy); *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 724 (2d Cir. 1994) (even though fumes within a blood bank exacerbated Plaintiff’s asthma, Plaintiff was not a disabled person under the Act because her asthmatic

24

To determine the appropriate reasonable accommodation made necessary by an employee's disability, federal regulations implementing the ADA provide for an "interactive process" involving both the employer and the employee. 29 C.F.R. § 1630.2(o)(3); *see Jackan v. New York State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000). Liability for failure to provide a reasonable accommodation ensues only when the employer is responsible for a breakdown in the process. *Thompson v. City of New York*, No. 03-4182, 2006 WL 2457694, at *4 (S.D.N.Y. Aug. 10, 2006); *see also Economou v. Caldera*, No. 99-12117, 2000 WL 1844773, at *24 (S.D.N.Y. Dec. 18, 2000). "[W]here, as here, the employer does not obstruct the process, but instead makes reasonable efforts both to communicate with the employee and provide accommodations based on the information it possessed, ADA liability simply does not follow." *Economou*, 2000 WL 1844773 at *24 (quoting *Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1137 (7th Cir. 1996)).

In this case, Plaintiff and Defendant engaged in an interactive process to determine appropriate accommodations for Mr. Krinsky. Specifically, the Medical Bureau of DOE evaluated Plaintiff's medical needs and provided him with an accommodation to a specific classroom at Madison, *i.e.* room 512B, with a dry chalkboard and with ventilation. When Plaintiff claimed that this room was inadequate, Plaintiff's Union, the UFT, hired Olmstead to perform an environmental study of Room 512B and the Courtroom. The Olmstead report concluded that not only did room 512B "meet the requirements listed in the Board of Education Accommodation" but that the Ruth Bader Ginsburg Courtroom was not appropriate for

---

condition did not substantially limit a major life activity – either her ability to breathe or to work); *Muller v. Costello*, 187 F.3d 298, 314 (2d Cir. 1999) ([A]lthough Plaintiff "presented evidence that his asthma was allergen-induced . . . there is not enough evidence of off-the-job breathing problems to find a substantial limitation of that life activity.").

Plaintiff's problem because of its carpeting.  Plaintiff provides no evidence that the DOE is responsible for a breakdown in the interactive process; he has only indicated dissatisfaction with the results.  However, under the ADA, "an employee has no right to any particular accommodation, but merely to a reasonable accommodation."  *Thompson*, 2006 WL 2457694 at *5 (quoting *Equal Employment Opportunity Commission v. Yellow Freight System, Inc.*, No. 98-2270, 2002 WL 31011859, at *21 (S.D.N.Y. Sept. 9, 2002)).   Here, although Krinsky was dissatisfied with his room assignment, Plaintiff has produced no evidence that the steps taken by the DOE were inadequate.  Because the DOE reasonably accommodated Mr. Krinsky in the interactive process required by the ADA, this claim must be dismissed.

Plaintiff also maintains that DOE retaliated against him in violation of the ADA because of his repeated attempts to gain reasonable accommodation for his disability.  The ADA prohibits discrimination "against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).  "[I]t is appropriate to apply the framework used in analyzing retaliation claims under Title VII in analyzing a claim of retaliation under the ADA."  *Sarno v. Douglas Elliman-Gibbons & Ives, Inc*. 183 F.3d 155, 159 (2d Cir. 1999).  Plaintiff's retaliation claims under the ADA are dismissed under the same rationale applied to Plaintiff's Title VII claims.

*I. Plaintiff's State Law Claims*

The decision whether to exercise supplemental jurisdiction is left to the discretion of the district court. *Ametex Fabrics, Inc. v. Just In Materials, Inc.*, 140 F.3d 101, 105 (2d Cir. 1998). Under 28 U.S.C. § 1367(c), a district court may decline to exercise supplemental jurisdiction over a state law claim where, as here, it dismisses all of the federal claims over which it has original jurisdiction. Because none of Krinsky's disputes with Defendants are cognizable under federal law, this Court will decline to exercise supplemental jurisdiction over his state law claims.

CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED in its entirety, and Plaintiff's motion for summary judgment is DENIED. Plaintiff's claims are dismissed. The Clerk of Court is directed to close this case.

SO ORDERED.

Dated: Brooklyn, New York
       May 25, 2007

_____/s/_____
SANDRA L. TOWNES
United States District Judge